UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

L.G., a minor, by and through his
parents and next friends, DROR GERGES
and SIVAN GERGES; DROR GERGES,
individually, father of L.G., a minor;
and SIVAN GERGES, individually, mother        REPORT AND
of L.G., a minor,                             RECOMMENDATION

                      Plaintiffs,        CV 2006-5864 (JBW)(MDG)

    - against -

MOGEN CIRCUMCISION INSTRUMENTS, LTD.,

                      Defendant.

- - - - - - - - - - - - - - - - - - X

GO, United States Magistrate Judge:

    Plaintiffs Dror Gerges and Sivan Gerges bring this product liability action on behalf of themselves and their infant son. The Honorable Jack B. Weinstein granted plaintiffs' motion for entry of default judgment and referred the motion to me to report and recommend on the issue of damages. See ct. doc. 19.

## FACTUAL BACKGROUND

    Plaintiffs commenced this action against defendants Mogen Circumcision Instruments, Ltd. ("Mogen") and Daniel J. Krimsky on October 30, 2006. See Complaint ("Compl.") (ct. doc. 1). Plaintiffs subsequently settled their claims against Mr. Krimsky. Mogen failed to file an answer or otherwise appear.

    On December 16, 2004, defendant Krimsky performed a Jewish ritual circumcision on plaintiff L.G., an eight day old male

infant, using a Mogen clamp, designed, manufactured, distributed and sold by defendant Mogen. See Compl. at ¶¶ 3, 8. During the circumcision, a significant portion of L.G.'s glans penis was severed. Id. at ¶ 9.

L.G. was taken to the emergency room at West Boca Medical Center, Boca Raton, Florida and examined by Dr. Charles E. Flack, M.D., a pediatric urologist. Declaration of Charles E. Flack, M.D. dated June 19, 2008 (ct. doc. 31) at ¶ 3. Dr. Flack found that all of L.G.'s penile shaft skin was missing and the glans penis was completely severed. Id. He concluded that the glans had been pulled into the jaws of the clamp during the circumcision resulting in the amputation. Id. Under general anesthesia, Dr. Flack re-covered the shaft with the skin remaining in the specimen and re-anastomosed the glans penis using a micro-surgical technique. Id. at ¶ 4. However, the operation was not a complete success. Id. at ¶ 5. Over the next two weeks, part of the glans became necrotic and black. Id. Dr. Flack removed the necrotic tissue, including much of the skin on the shaft. Id. As a result, L.G. no longer has a glans penis. Id. at ¶ 6. Dr. Flack anticipates that when L.G. is older, he may need to release the penile shaft skin and perform a skin graft in order for L.G. to have the best penile function possible under the circumstances. Id. Although Dr. Flack projects that L.G. will be able to have sexual intercourse and reproduce, the sexual experience will not be the same as if he had a glans

penis.  Id.

Dr. Joseph Shrand, a child and adolescent psychiatrist, opines that L.G. is "greatly at risk for both internalizing and externalizing psychiatric disorders."  Declaration of Joseph Shrand, M.D. dated May 29, 2008 ("Strand Decl.") (ct. doc. 28) at ¶ 2; Psychiatric Consultation Report at 4 (attached to Strand Decl.)  Such internalizing disorders include chronic depression and anxiety disorders which could result in phobic avoidance of society, severe depression and risk of suicide.  Psychiatric Consultation Report at 4.  He could also manifest externalizing disorders causing him to become angry and aggressive.  Id.  Throughout his development, L.G. and his parents will require psychiatric counseling.  Id.

The instructional brochure accompanying each Mogen clamp states that there is "NO injury to glans possible, because of beveled under edge and narrow aperture."  Compl. at ¶ 25; Pls.' Sec. Supp. Mem., Exh. A (ct. doc. 34).  However, by the end of 1996, at least three cases of glanular amputation using the Mogen clamp had been reported in the medical literature.  In 1996, an article in the journal Pediatrics stated that one physician had reported a case of glanular amputation using the Mogen clamp and that "[t]he company producing this clamp refused to accept a report of this occurrence or reveal whether they had knowledge of similar occurrences."  See Strimling, B.S., "Partial Amputation of Glans Penis During Mogen Clamp Circumcision," 97 Pediatrics

906-07 (1996) (attached to Pls.' Sec. Supp. Mem. as Exh. B). Another article published in 1996 reported a number of glanular reattachments following circumcisions, including one in which the Mogen clamp was used. See Sherman, J., et al., "Circumcision: Successful Glanular Reconstructions and Survival Following Traumatic Amputation,", 156 The Journal of Urology, 842-44 (August 1996) (attached to Pls.' Sec. Supp. Mem. as Exh. C). A third article published in 1996 noted that "[a] few cases of inadvertent partial glans amputation during Mogen circumcision have been reported." Reynolds, R.D., "Use of the Mogen Clamp for Neonatal Circumcision, 54 American Family Physician 177-182 (1996) (attached to Pls.' Sec. Supp. Mem. as Exh. D).

On August 29, 2000, the United States Food and Drug Administration issued a warning concerning the potential for injury from use of the Mogen clamp. See "Potential Injury from Circumcision Clamps," U.S. Food and Drug Administration, Rockville, MD 20857, Aug. 29, 2000 (attached to Sec. Supp. Mem. as Exh. E). The notice stated that "the clamp may allow too much tissue to be drawn through the opening of the device, thus facilitating the removal of an excessive amount of foreskin and in some cases, a portion of the glans penis."

## DISCUSSION

I. Legal Standards Governing Default

A default constitutes an admission of all well-pleaded factual allegations in the complaint, except for those relating

-4-

to damages. Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981). A default also effectively constitutes an admission that damages were proximately caused by the defaulting party's conduct: that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged. Greyhound, 973 F.2d at 159. The movant need prove "only that the compensation sought relate to the damages that naturally flow from the injuries pleaded." Id.

The court must ensure that there is a reasonable basis for the damages specified in a default judgment. In determining damages not susceptible to simple mathematical calculation, Fed. R. Civ. P. 55(b)(2) gives a court the discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence. Action S.A. v. Marc Rich and Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991) (quoting Fustok v. Conticommodity Serv, Inc., 873 F.2d 38, 40 (2d Cir. 1989)). The moving party is entitled to all reasonable inferences from the evidence it offers. Au Bon Pain, 653 F.2d at 65; Directv, Inc. v. Hamilton, 215 F.R.D. 460, 462 (S.D.N.Y. 2003).

II. Liability of Defendant

Plaintiffs contend that Florida law applies to this case, including that state's statutory limitation on punitive damages.

-5-

A federal court sitting in diversity must apply the choice of law rules of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Curley v. AMR Corp., 153 F.3d 5 (2d Cir. 1998). Under New York law, the "first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws." Curley, 153 F.3d at 12. As noted below, there is no conflict between the laws of New York and Florida regarding claims of negligence and product liability. However, since Florida law limits the amount of punitive damages that may be awarded while New York law does not, a true conflict exists between the laws of these jurisdictions. See Sheldon v. PHH Corp., 135 F.3d 848, 853 (2d Cir. 1998).

When a conflict of laws arises in actions sounding in tort, New York courts use an "interest analysis" to determine which of the competing jurisdictions has the greater interest in having its law applied to the underlying controversy. See Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 521-22 (1994); Babcock v. Jackson, 12 N.Y.2d 473, 481 (1963); see also AroChem Int'l, Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992). In the case of a conflict of laws regulating conduct, the law of the place of the tort is ordinarily applied. See Padula, 84 N.Y.2d at 522; Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 198 (1985). The courts in the Second Circuit "have repeatedly held that punitive damages are conduct-regulating," rather than loss
-6-

allocating, and applied the law of state of the injury. See Guidi v. Inter-Continental Hotels Corp., No. 95 Civ. 9006, 2003 WL 1907901, at *3-*4 (S.D.N.Y. 2003) (citing cases); see also In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001, No. MDL 1448, 2006 WL 1288298, at *28 (S.D.N.Y. May 9, 2006); Townes ex rel. Estate of Townes v. Cove Haven, Inc., No. 00CV5603, 2004 WL 2403467, at *2 (S.D.N.Y. Oct. 27, 2004). This is because "punitive damages are not meant to compensate the plaintiff, but rather are designed to punish the defendant for egregious conduct." Wilson v. Chevron Chemical Co., No. 83 Civ. 762, 1986 WL 14925, *3 (S.D.N.Y. Dec. 17, 1986); cf. Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d 309, 316-317 (N.Y. 1994) (noting that "the purpose of punitive damages is solely to punish the offender and to deter similar conduct on the part of others"). Florida has an interest in loss allocation as well as evidenced by its limits on punitive damages awards. See Simon v. Philip Morris Inc., 124 F. Supp. 2d 46, 72-73 (E.D.N.Y. 2000). Thus, the determination of punitive damages is governed by Florida law.

Plaintiffs allege claims for product liability under theories of both strict liability and negligence for failure to include proper warnings. Both strict liability and negligent failure to warn cases require that plaintiff prove: 1) that the warnings accompanying the item were inadequate; 2) that the inadequacy of the warnings proximately caused Plaintiff's injury;

and 3) that Plaintiff in fact suffered an injury by using the product.  See Valencia v. Sanborn Mfg. Co., No. 04-21416-CIV, 2005 WL 5957819, at *12 (S.D. Fla. Aug. 11, 2005); accord Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 369-70 (S.D.N.Y. 2003) (New York law).  "A manufacturer has a duty to warn where its product is inherently dangerous or has dangerous propensities."  Scheman-Gonzalez v. Saber Mfg. Co., 816 So.2d 1133, 1139 (Fla. Dist. Ct. App. 2002); accord Village of Groton v. Tokheim Corp., 608 N.Y.S.2d 565, 566 (3d Dep't 1994) (New York law).  To establish strict liability for failure to warn, plaintiff must prove that defendant (a) is a manufacturer or distributor of the product at issue, and (b) did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution.  Marzullo v. Crosman Corp., 289 F. Supp. 2d 1337, 1347 (M.D. Fla. 2003); accord Figueroa, 254 F. Supp.2d at 370.  To warn adequately, the product label must make apparent the potential harmful consequences.

Here, plaintiffs' allegations amply establish that defendant Mogen failed to warn of the known dangers of using the Mogen clamp resulting in L.G.'s injury.  In fact, plaintiffs allege that defendant not only failed to include a warning of the danger of glanular amputation, defendant represented that the clamp insured that "NO injury to glans [is] possible, because of

beveled under edge and narrow aperture."

III. Determination of Damages

Under Florida law, recoverable damages include all damages "'which are a natural, proximate, probable or direct consequence of the act . . . .'" Alphamed Pharm. Corp. v. Arriva Pharm. Corp., 432 F. Supp. 2d 1319, 1344 (S.D. Fla. 2006) (quoting Taylor Imp. V. Smiley, 143 So.2d 66, 67-68 (Fla. Dist. Ct. App. 1962)). The elements of damages that may be considered include: 1) bodily injury; 2) pain and suffering; 3) disability; 4) disfigurement; 5) mental anguish; 6) loss of capacity for the enjoyment of life; and 7) hospital and medical expenses. See Fraysier v. United States, 565 F. Supp. 1085, 1090 (S.D. Fla. 1983), aff'd, 766 F.2d 478 (11th Cir. 1985).

Plaintiffs request compensatory damages for Dror and Sivan Gerges in the amount of $398,355.48 consisting of: 1) past medical expenses of $24,355.48; 2) the cost of future surgery in the amount of $10,000; and 3) the cost of future psychiatric care for L.G. and his family in the amount of $364,000. Plaintiffs request compensatory damages for L.G. in the amount of $5,000,000 for past, present and future pain and suffering.

In support of their claim for past medical expenses, the Gerges submitted invoices from West Boca Medical Center and Dr. Flack reflecting charges in the amount of $24,535.48.[1] See

---

[1] The invoice from Dr. Flack shows charges in the amount of
(continued...)

Second Declaration of Dror Gerges ("Sec. Gerges Decl.") (ct. doc. 29), Exh. A. Plaintiff also submitted the declaration of Dr. Joseph Shrand, a board certified psychiatrist. Dr. Shrand states that L.G. and his parents will require professional therapy through his adolescence. Dr. Shrand considers it probable that L.G. will require psychotherapy once or twice a week at various stages of development. Dr. Shrand further states that a conservative estimate of the cost of L.G.'s future psychiatric care is $182,000, which would include twice weekly psychotherapy at $175 per hour for ten years. In addition, his parents would incur the same cost for their own therapy in support of L.G. These claims for damages are well supported by the evidence submitted. Finally, plaintiffs have submitted a declaration from Dr. Flack opining that L.G. <u>may</u> require additional surgery to release the penile shaft skin and a skin graft which would cost no less than $10,000. However, "only medical expenses which are reasonably certain to be incurred in the future are recoverable." <u>Loftin v. Wilson</u>, 67 So.2d 185, 188 (Fla. 1953); <u>see</u> <u>Truelove v. Blount</u>, 954 So.2d 1284, 1287-88 (Fla. Dist. Ct. App. 2007); <u>Kloster Cruise Ltd. v. Grubbs</u>, 762 So.2d 552, 556 (Fla. Dist. Ct. App. 2000). Dr. Flack's declaration falls short of demonstrating that plaintiffs are reasonably certain to incur these expenses.

---

[1](...continued)
$6,310 rather than $6,130 as stated in plaintiffs' memorandum. <u>Compare</u> Sec. Gerges Decl., Exh. A <u>with</u> Pls.' Mem. (ct. doc. 27) at 7.

Accordingly, I recommend that Dror and Sivan Gerges be awarded $388,535.48 in compensatory damages.

As to plaintiffs' request for compensatory damages for L.G., Florida courts recognize that since "[p]ain and suffering . . . are not capable of being exactly and accurately determined, . . . the award for pain and suffering must be limited to compensation . . . . for, or made because of, the suffering consequent upon the injury." Loftin, 67 So.2d at 189. Although each case is different, considering the amounts awarded in similar cases can be helpful. See id.

In 2007, the Superior Court of Massachusetts awarded a $7.5 million default judgment against defendant Mogen for the plaintiff's past, present and future mental and physical pain and suffering.[2] See Maame v. Mogen Circumcision Instruments, Ltd., No. 20061234A, 2007 WL 2706273 (Mass Super. Aug. 24, 2007). There, the infant plaintiff suffered an amputation of a substantial part of his foreskin due to his physician's use of a Mogen clamp during a circumcision that was performed in 2000. Despite corrective surgeries, the plaintiff cannot urinate in a normal fashion. The court found that from the time of the injury to the present, the plaintiff suffered continuous and uninterrupted pain and mental anguish.

In 2005, a New York jury awarded $1.5 million to a male

---

[2] Massachusetts allows punitive damages only when permitted by statute. See Flesner v. Technical Comms. Corp., 410 Mass. 805, 813 (1991).

-11-

infant who suffered a partial loss of his penis during a circumcision.  See Rodriquez v. New York City Health & Hosps. Corp., 2005 WL 4169559 (N.Y. Sup. Ct. 2005).

In 2007, a Kings County jury awarded $6.5 million to a 60 year old man whose penis was partially amputated, resulting in irreversible impotence and a severely deformed and fore-shortened penis.  The plaintiff had developed an infection after surgery which his doctor failed to recognize and treat.  See Doe v. Papadatos M.D., 2007 WL 2197821 (N.Y. Sup. Ct. 2007).

In 2009, a Fulton County, Georgia jury awarded $2.3 million to a male infant who lost approximately one third of the glans penis from a botched circumcision.  See D.P. v. Sonyika, 2009 WL 1199265 (Ga. State Ct. 2009).

In this case, L.G. no longer has a glans penis, the head of the penis.  Plaintiffs have sufficiently established substantial physical and psychological injuries.  While it is expected L.G. will be able to have sexual intercourse as an adult and reproduce, he will not be able to have the same sexual experience as he would have had.  L.G. is also at high risk of suffering profound psychological effects throughout his lifetime.  He is likely to be embarrassed by his physical appearance and have trouble forming meaningful attachments, including developing meaningful relationships with girls as an adolescent.  At 3 years old, L.G. is aware that he looks different from other boys based on both his own observations and comments from other children which make him feel inferior.  Transcript of hearing held on July

3, 2008 at 27-29 (ct. doc. 37).  As a result of his injury, he experiences pain when he urinates and has trouble urinating normally.  Id. at 28-29, 32.  This has delayed his potty training which causes difficulty at school.  Id. at 32.  He is also at risk for becoming aggressive in an attempt to compensate for low self-esteem.  Even as an adult, L.G. is more likely to have psychiatric illness, difficulty with his sexuality, and is less likely to marry.

In light of the foregoing, I recommend awarding L.G. $5 million in damages for past, present and future pain and suffering as requested.

Plaintiffs also seek punitive damages against defendant Mogen under Florida law.  Under section 768.72, a defendant may be held liable for punitive damages if the defendant is shown by clear and convincing evidence to be grossly negligent -- that is, defendant's conduct constituted a conscious disregard for the safety of persons exposed to such conduct.  See Fla. Stat. Ann. § 768.72 (2)(b).  Any award of punitive damages is limited to the greater of three times the amount of compensatory damages or $500,000 subject to certain exceptions.  See id. § 768.73(1)(a).  One exception is that the wrongful conduct was motivated solely by unreasonable financial gain and that a managing agent, director or officer of the defendant actually knew about the unreasonably dangerous conduct and the high likelihood of injury resulting from the conduct.  Id. § 768.73(1)(b).  In that event, the award of punitive damages is limited to the greater of four

times the amount of compensatory damages or 2,000,000.  Id.

I recommend finding that punitive damages are warranted for defendant's reckless failure to warn of the dangers of using the Mogen clamp such that it constituted a conscious disregard or indifference to the safety of those exposed to its use.  The Pediatrics article published in 1996 stated that the defendant refused to accept a report of the partial amputation of an infant's glans penis or reveal whether they had knowledge of similar occurrences.  The American Family Physician article also published in 1996 stated that a few cases of inadvertent partial glans amputation during Mogen circumcision had been reported. The Journal of Urology article published in 1996 reported a number of glanular reattachments, including one where the circumcision involved use of the Mogen clamp.  According to the FDA Notice, the FDA received 105 reports of injuries involving circumcision clamps between July 1996 and January 2000.  In 2000, the defendant was served with a complaint in Georgia alleging that an infant plaintiff was injured by a Mogen clamp during a circumcision and citing the above articles.  See B.C. v. Zane, Superior Court of Fulton County, Georgia (complaint and return of service faxed to chambers on July 8, 2008).  Yet, not only did defendant fail to warn of the dangers of using the Mogen clamp, its brochure states, "No injury to glans possible."

The purpose of punitive damages is to "punish the wrongdoer."  See St. Regis Paper Co. V. Watson, 428 So.2d 243,

247-48 (Fla. 1983); see also Myers v. Cent. Fla. Invs., Inc., 592 F.3d 1201, 1206 (11th Cir. 2010). Punitive damages must be proportionate to the actual harm inflicted on the plaintiff. See Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 921 So.2d 43, 48 (Fla. Dist. Ct. App. 2006). Accordingly, I recommend awarding plaintiffs Dror and Sivan Gerges punitive damages in the amount of $388,535.48 and awarding plaintiff L.G. punitive damages in the amount of $5 million.

## CONCLUSION

For the foregoing reasons, I recommend that the Court award plaintiffs Dror and Sivan Gerges $777,070.96 in damages and plaintiff L.G. $10 million in damages.

This report and recommendation will be filed electronically and a copy sent by overnight mail to the defendant on this date. Any objections to this Report and Recommendation must be electronically filed, with a courtesy copy sent to the Honorable Jack B. Weinstein and the undersigned, by July 12, 2010. Failure to file objections within the specified time waives the right to appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

**SO ORDERED.**

Dated:   Brooklyn, New York
         June 25, 2010

                                        /s/
                                        MARILYN D. GO
                                        UNITED STATES MAGISTRATE JUDGE